Patrick Stephen KELLY, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–09–00166–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

June 17, 2010.

James W. Volberding, Tyler, for appellant.

Michael J. West, Tyler, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and CHRISTOPHER.

1. *See Pittman v. State*, No. 14–08–00710–CR, tried in March 2008; *Mayo v. State*, Nos. 14–08–00622–CR, 14–08–00623–CR, 14–08–00624–CR, tried in May 2008. All three appeals were transferred to this court.

## OPINION

TRACY CHRISTOPHER, Justice.

Appellant Patrick Stephen Kelly, the third of the alleged "Mineola Swingers"[1] tried in Smith County, Texas, was charged with and convicted in August 2008 of a single count of engaging in organized criminal activity. The organized criminal activity involved two predicate offenses of aggravated sexual assault of a child. He was sentenced to confinement for life. In forty-three issues, appellant challenges numerous aspects of his trial. In this opinion we will review only those points of error essential to our decision. We conclude the evidence was legally sufficient to support the conviction, but we find the case should be reversed and remanded for a new trial due to numerous evidentiary errors by the trial court and improper closing argument by the State. These errors prevented appellant from presenting a complete defense to the jury, resulted in other harm to the appellant, and violated appellant's right to confront the witnesses against him.

### I. Background

This case began in March 2005 when the Department of Family and Protective Services ("DFPS") authorities in Smith County removed two children, Shannon, age seven, and Holden, age six,[2] from the home their mother Shauntel Mayo shared with Jamie Pittman. The children were removed after allegations of abuse and neglect were received by Smith County DFPS. After their removal, the children were placed in several foster homes before being placed with foster parents John and Margaret Cantrell. At their first few foster homes, there were indications of prob-

2. We have employed pseudonyms for the children to protect their identities.

lems with the children: Holden suffered from bowel issues and was very aggressive, and Shannon acted very afraid.

Several months after being removed from their parents and once they were placed with the Cantrells, the children began to make outcries involving a ring of adults, including appellant. These adults allegedly engaged in training the children, along with their younger sister, Cathy, age four, and their aunt, Ginny, age six, to perform in a sexual manner in a club. The outcries began when the Cantrells took Shannon and Holden by an empty building they were considering purchasing in Mineola. The Cantrells immediately took the children to the Mineola Police Department (the "Mineola PD") in Wood County, but after a one- to two-day investigation, the Mineola PD did not file any charges.[3]

Because the children were removed from their home in Smith County, the Cantrells and the Smith County DFPS enlisted the assistance of the Smith County District Attorney's office to further inquire into the children's allegations. Texas Ranger Phillip Kemp opened an investigation after being contacted by the Smith County District Attorney's office. Kemp interviewed Shannon and Holden and through his investigation discovered that Cathy and Ginny were also involved in the alleged sexual exploitation ring. Cathy and Ginny were both removed from the home of Sheila and Jimmy Sones.[4] Cathy also was placed with the Cantrells; Ginny was first placed with Sheri Ellington and then was placed with Virginia Bookout.

Shannon and Holden identified the building in Mineola as a "club" in which they had performed sexual acts for numerous adults in exchange for money collected by appellant and others, including Mayo. The children described a "sexual kindergarten" in which adults[5], including Pittman, Mayo, and appellant, trained them to masturbate, strip, and engage in sexual contact with each another. The children then performed sexual acts at the club in Mineola, where numerous other adults watched, paid money, and filmed them engaging in the acts. The children also explained that the adults (Pittman, Mayo, and appellant) had given them "silly pills," which made them more willing to act in this manner.

Following Kemp's investigation, appellant and others were indicted for multiple counts of aggravated sexual assault of a child, sexual performance of a child, and engaging in organized criminal activity. Appellant was charged with engaging in organized criminal activity; with two predicate offenses of aggravated sexual assault of a child involving Shannon and Holden.

The evidence at appellant's trial was hotly contested. Appellant took the stand and denied the allegations. The club had been leased to Russ and Sherry Adams, was open for only four months, and closed in September 2004. Sherry Adams testified that she had the only key to the club and that the club was for adults only. She denied ever seeing appellant at the club. Appellant presented several other witnesses who testified that they were at the club and that no children were ever present and that appellant was never at the club.

---

3. Shannon and Holden denied the allegations during a Wood County Children's Assessment Center interview.

4. Sheila is the mother of Mayo and Ginny and the grandmother of Shannon and Holden.

5. Cases are pending in a Smith County district court against three other defendants, including Dennis Pittman, Sheila Sones, and Jimmy Sones.

The children initially denied abuse or that anything had happened in the club. Shannon and Holden were interviewed twice in May and June 2005 and denied any abuse. The Kemp interview took place in November 2005, and it was in this interview that Shannon first described the alleged abuse. Holden initially denied the abuse until both Shannon and Margaret Cantrell were allowed to question him and lead him into remembering abuse. Neither child identified a picture of appellant in this interview.

Neither Margaret nor John Cantrell testified, even though Margaret was the designated outcry witness for Shannon, Holden, and Cathy. Shortly before the trial began, appellant's trial counsel discovered that John was being investigated in California for a claim of sexual abuse of foster children. Both John and Margaret were subpoenaed to testify for appellant, but outside the presence of the jury, both invoked their Fifth Amendment right not to testify. The trial court then refused to allow any questioning of any witness about this claim against John Cantrell, any possible motive for Margaret Cantrell to have "coached" the children, or why Margaret Cantrell was not testifying in this trial as she had in the two prior trials.

After hearing all the evidence and arguments of counsel, the jury found appellant guilty as charged in the indictment and sentenced him to confinement for life. Appellant timely appealed.

## II. Issues Presented

Appellant identified forty-three issues for our review. We will not discuss the issues that are unnecessary to our decision. We will first review the legal sufficiency of the evidence (issue 24), then violation of the right to present a complete defense, certain evidentiary errors and improper jury argument, and finally, violations of the Confrontation Clause. Be-

cause we conclude that those errors support reversal, we do not reach appellant's issues one, four through nine, eleven and twelve, eighteen, twenty through twenty-three, twenty-five, and twenty-eight through forty-three.

We begin our review of appellant's issues by discussing the only issue he identifies which would require us to reverse and render a judgment of acquittal: the legal sufficiency of the evidence.

## III. Analysis

### A. Legal Sufficiency

■ In his twenty-fourth issue, appellant asserts the evidence is legally insufficient to support his conviction. When reviewing the legal sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Williams v. State*, 301 S.W.3d 675, 683–84 (Tex.Crim.App.2009). Although we consider all the evidence presented at trial, we may not re-weigh the evidence or substitute our judgment for that of the jury. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App.2007). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony; likewise, it is the exclusive province of the jury to reconcile conflicts in the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex.Crim.App.2000) (en banc). Our review of the evidence includes both properly and improperly admitted evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007). We consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence in making our determination. *Id.*

Appellant was charged with the offense of engaging in organized criminal activity, with two predicate offenses of aggravated sexual assault of a child. A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit a listed predicate offense. TEX. PENAL CODE ANN. § 71.02(a) (Vernon Supp.2009); see Nguyen v. State, 1 S.W.3d 694, 695 (Tex.Crim. App.1999) (en banc). One of the predicate offenses listed in section 71.02(a) is aggravated sexual assault. TEX. PENAL CODE ANN. § 71.02(a)(1). As is relevant here, a person commits aggravated sexual assault if he intentionally or knowingly causes the sexual organ of a child under fourteen to contact or penetrate the sexual organ of another person. TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii), (a)(2)(B). The testimony of the complainant is sufficient, without more, to convict a defendant of sexual assault. See TEX.CODE CRIM. PRO. ANN. art. 38.07(a), (b)(1) (Vernon 2005).

Shannon, Holden, Ginny, and Cathy testified at trial. Shannon, age eleven at the time of appellant's trial, testified that she knew appellant as "Booger Red" and identified him in court. She described appellant as a friend of her mother who was at the Mineola club. She explained that she went to the club with Holden and Cathy and often saw Ginny there. Shannon testified that before performing at the Mineola club, she and the other children attended "kindergarten" where they learned how to touch themselves and each other and how to dance. She stated that appellant and Jamie Pittman taught the girls at this "kindergarten," while her mother, Shauntel Mayo, and her "granny," Sheila Sones, taught the boys. According to Shannon, kindergarten was sometimes conducted in appellant's home. She stated that she and Holden "played doctor" at the Mineola club and that when they did, her privates touched Holden's privates while they both had their clothes off. She testified that appellant was at the club "watching, sometimes do[ing] nasty stuff." Shannon explained that she often wore revealing clothing and danced at the Mineola club, where a large group of unidentified adults watched and paid money to the adults—appellant, Mayo, Pittman, and others. She also testified that she, appellant's wife, Mayo, and occasionally Ginny were videotaped dancing at the club. Shannon explained that these videotapes were burned at appellant's house. She further testified that she was given "silly pills" by her mother and Pittman and that appellant was often there when she took the pills.[6]

Holden, who was nine years old at the time of appellant's trial, testified as follows: He identified appellant as "Booger Red," the "meanest guy" he knew. He, like Shannon, described a sexual "kindergarten," where he learned how to do "bad stuff" by rubbing on dolls. He also described and identified the Mineola club; he testified that his mother and Jamie Pittman took him there and that appellant also was there. He explained that he and Shannon "played doctor" at the club in front of other people and that his privates touched her privates. According to Holden, the people in the audience also paid to watch him dance. He also stated that he

---

**6.** During appellant's lengthy cross-examination of Shannon, she described several rather bizarre incidents. For example, Shannon described an incident that she said occurred at the Mineola club where, during a video-taped "play," Jamie Pittman shot her brother Holden's dog. (Although Holden described a similar dog-shooting incident, he described the dog very differently from Shannon and claimed the shooting occurred out-of-doors.) She further described an occasion at the club when Pittman hung several live chickens. Shannon also testified that Sheila Sones and Holden were able to cast magic spells.

was sometimes videotaped by Jamie or Dennis Pittman when he was dancing, but that these tapes were burned at appellant's house. Holden identified Sheila Sones as another individual who was involved with the club; according to Holden, Sones helped make food at the club and watched him perform.

Cathy, age eight at the time of the trial, testified that she used to live with her grandmother, Sheila Sones. Cathy explained that she is the sister of Shannon and Holden. She, too, identified appellant as "Booger Red" and stated she knew him from the Mineola club. She testified that she went to kindergarten, but appellant was not there. According to Cathy, she saw Shannon at the club with Mayo, Jamie Pittman, and appellant. She, like Holden, explained that Sones served food at the club. According to Cathy, "bad things" happened at the club; for example, she testified that Holden and Shannon had to take their clothes off at the club.[7]

Nine-year-old Ginny testified as follows: She lived with Sheila and Jimmy Sones prior to being removed from their custody by DFPS. She described "kindergarten" as a place where "sexual stuff" happened and where she danced with Cathy, Shannon, and Holden. She identified appellant as "Booger Red" and stated that he was at the kindergarten. She also testified that she did "sexual stuff" with the other children at the Mineola club. She said appellant made her dance, and she was scared of him. She explained that Shannon and Holden danced together at the club and "sometimes their privates would touch." Ginny testified that she danced both with clothes on and naked while people watched. She said that tapes were made

when she danced, but that Jamie Pittman and appellant burned them. She testified that the adults, including appellant, got money from people watching the performances at the club.

Numerous other witnesses testified, both for the State and for the defense. Several DFPS caseworkers recounted their investigation and the outcries made by the children to various individuals. Additionally, Kemp described his investigation and repeated the children's outcries. Kemp and several of the caseworkers testified that they believed the children were telling the truth. They also testified that appellant was involved in "collaborating and carrying out" criminal activity with Mayo, Sheila Sones, Jimmy Sones, Jamie Pittman, and Daniel Pittman; this "criminal activity" included the sexual contact between Shannon and Holden.

Shannon and Holden testified that their sexual organs contacted each other's. Their testimony is sufficient to establish that they were sexually assaulted. *See id.* Shannon testified that appellant, Jamie Pittman, and Shauntel Mayo were involved in the "kindergarten," were all present at the club when she and Holden danced and performed sexually, and shared in the money collected from the other club patrons. Cathy and Ginny also identified appellant, Mayo, Jamie Pittman, Sheila Sones, Jimmy Sones, and Dennis Pittman as being involved in the scheme. This evidence is legally sufficient to establish that appellant intentionally participated in a combination involving at least three others to commit aggravated sexual assault. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (engaging in organized criminal activity);

---

7. During a video-taped interview played for the jury, Cathy also made some strange claims. For example, when Kemp asked her about costumes, she explained that she dressed as a witch at the club. She said she flew around the club on a broomstick; she also said that Shannon dressed as a ghost and floated around the club, and Holden dressed as a bear and crawled around the club.

TEX. PENAL CODE ANN. § 71.01(a) (Vernon 2003) (defining "combination" as "three or more persons who collaborate in carrying on criminal activities"). We therefore overrule appellant's twenty-fourth issue regarding the legal sufficiency of the evidence.

Although the evidence is legally sufficient to support appellant's conviction and thus we do not reverse and render acquittal, the record of this case is rife with reversible error, which we detail in the following sections.

## B. Denial of the Opportunity to Present a Defense

■ In his second and third issues, appellant asserts the trial court violated his constitutional right to present a complete defense because the trial court refused to permit him to develop his theory that John Cantrell abused the children and that the Cantrells coached them to falsify the allegations against him. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment ... or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, ... the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). A trial court's ruling excluding evidence may rise to the level of a constitutional violation if "a trial court's clearly erroneous ruling [excludes] otherwise relevant, reliable evidence which 'forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a

defense.'" *Wiley v. State*, 74 S.W.3d 399, 405 (Tex.Crim.App.2002) (quoting *Potier v. State*, 68 S.W.3d 657, 665 (Tex.Crim.App. 2002) (en banc)).

■ The State did not inform appellant about the charges against John Cantrell. Appellant discovered this through information supplied by the Wood County District Attorney's office.[8] The trial court granted appellant a brief continuance to discover information regarding the charges pending against John Cantrell in California and Margaret's possible involvement in them. John Cantrell had been extradited to California at the time of this trial. The trial court assisted appellant in having John Cantrell returned from California. Outside the presence of the jury, both John and Margaret Cantrell then asserted their Fifth Amendment privilege not to testify.

The trial court repeatedly instructed appellant that he would not be permitted to introduce any evidence regarding the charges against John Cantrell in California. Agreeing that the evidence was not relevant, the trial court granted the State's oral motion in limine preventing appellant's counsel from mentioning to the jury that John had been investigated or arrested on sexual assault charges in California:

> So before you were to mention it or bring it up or ask any witness about it or however it might possibly come up or in opening statement or however, that— the Court's ruling is that those allegations against John Cantrell out in California made by the witnesses that are in those reports that we all have and counsel has, the State has, the Court has, *are not relevant to the trial of this case.*

For further discussion of alleged *Brady* violations in all three of these trials, we refer the reader to *Pittman v. State*, No. 14–08–00710–CR, slip. op. at 8–11.

8. In his first issue, appellant asserts that the State violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by concealing impeaching or exculpatory evidence about John and Margaret Cantrell.

(emphasis added). But relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Clearly, allegations that John Cantrell had committed similar offenses—sexual abuse of children under his care—were relevant to appellant's claim that it was John, not he, who had sexually assaulted Shannon and Holden. This evidence also was relevant to his defense that the Cantrells coached the children into making up these accusations to divert attention from the charges against John and the possibility that he sexually abused Shannon and Holden. This evidence would have shown the Cantrells' bias, motive, or interest in accusing appellant and was clearly relevant. *See Hammer v. State*, 296 S.W.3d 555, 569 (Tex.Crim.App. 2009)

Each time appellant's defense team attempted to bring these allegations to light and demonstrate their relevance or cross-examine witnesses about the Cantrells, the trial court warned them against doing so:

> I've already told you—in fact, I told you when you were standing there on the record that I'm not going to allow you to go into anything about [John Cantrell] that relates to these records that I turned over to you. . . . I told you I'm not going to allow you to go into anything about that, into anything about that, to allow you in the presence of the

jury—outside the presence of jury to *determine it to be relevant.* Don't go there.[9]

(emphasis added).

After the State rested and before appellant's counsel made his opening statement, the trial court reminded appellant:

> Are all the Court's rulings clear as far as what I've said on the record that are contained in the CPS reports I've furnished Mr. Davidson [10] in terms of the fact that the Court's ruling, those as the record stands now, none of those allegations are relevant to this case. None of the allegations made—that grew out of the situation in California.
>
> I've tried to go over that specifically so it's clear to everyone that the Court is finding that at this point not relevant.

Finally, when appellant's counsel approached the bench to suggest that the State's cross-examination of one of appellant's witnesses had "opened the door" to the introduction of these allegations, the trial court stated unequivocally, "Let me make this clear. We're not going to have any cross or direct on anything that would lead to any response from the witness about anything done in the California case. Everyone knows that's out."

■ Evidence that the children's current foster parent, John Cantrell, had been accused of sexually molesting foster children under his care in the past was certainly relevant to appellant's defense. *See* TEX.R. EVID. 401. Thus, the trial court's exclusion of this evidence on relevancy grounds was erroneous.[11] *See Wiley*, 74

---

9. These excerpts are two examples where the trial court warned appellant to stay away from any questions that might bring to light the allegations against John Cantrell, which appellant alleged showed the Cantrells' motivation to coach the children into fabricating the charges against him. Appellant has identified numerous other examples in his brief. We thus disagree with the State's contention that he did not preserve error on these issues.

10. Thad Davidson and Tina Brumbelow represented appellant at trial; the State was represented by Joe Murphy and Jason Parrish.

11. The State also responds to this argument by asserting these allegations were inadmissible under Texas Rule of Evidence 608(b), which provides that specific instances of a witness's conduct are not admissible to attack or support credibility. But appellant was not attempting to attack or impeach John Cantrell's credibility with this information. He

S.W.3d at 405–06. Further, by refusing to permit appellant to present this evidence to the jury, appellant was effectively denied the opportunity to present his defense. *See Crane,* 476 U.S. at 690, 106 S.Ct. 2142. Indeed, this evidence went "to the heart of [appellant's] defense." *See Wiley,* 74 S.W.3d at 405. Information regarding the ongoing investigation of John Cantrell in California would have provided the jury with evidence that the Cantrells had a motive to coach the children. Instead, the jury was left with appellant's unexplained implication that the Cantrells had coached the children into making up these allegations. The State was able to inoculate against this incomplete defense by asking its witnesses if they believed the children had been coached; these witnesses repeatedly stated they did not think the children had been pressured into making these accusations. Thus, the jury was left wondering why appellant would cast such aspersions on the character of the Cantrells, who had taken on so many children with great success over the years with no complaints against them. Incredibly, the prosecutor made a sidebar in front of the jury, as part of his hearsay objection, that appellant should just call Margaret Cantrell to the witness stand if he wanted certain evidence.

Of course, the believability of the children's testimony is at the heart of this case. There were no outcries by any child until after Shannon and Holden had been placed with the Cantrells. The first outcry was made to Margaret Cantrell.

Shannon and Holden denied the allegations in their initial assessment interviews conducted in Wood County, and it was not until five months later that the children told anyone other than Margaret Cantrell about the alleged abuse. This occurred during Kemp's interview, at which Margaret Cantrell was present and allowed to ask questions. Holden repeatedly denied the allegations in that interview until Shannon was allowed into the interview to remind him of what had happened and until he was allowed to talk directly to Margaret during the interview.

Appellant took the stand and denied the allegations. His witnesses testified that appellant had never been at the club and that no children were ever present at the club, which was open only from May to September of 2004. Appellant's expert witness testified that Kemp's interviews of Shannon and Holden were improper because Shannon was allowed to suggest answers to Holden and because Margaret Cantrell was present and asked questions and suggested answers to both Shannon and Holden. In fact, it was Margaret Cantrell who suggested Booger Red's name to Shannon. Appellant's expert also testified that Kemp's interviews of Cathy and Ginny were improper due to the use of leading questions, suggestive answers, and the improper presence of the foster parents. He further testified that children can make false accusations if they are coached into doing so.

was attempting to establish his defense that if the children were abused, John Cantrell was responsible and the Cantrells coached the children into making these allegations to cast the blame on others and divert attention from the California allegations. *See Holmes v. South Carolina,* 547 U.S. 319, 328–31, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (disapproving of evidentiary rules that operate to unreasonably restrict the admission of evidence proffered by criminal defendants to show someone else committed the crime with which they are charged).

The State and the trial judge also recognized that this evidence could have been relevant to show bias. The State, over objection, was allowed to impeach appellant's witness, Anlique Stamps, the bartender at the Brass Star Club, with the fact that her children had been once removed by DFPS.

Under these circumstances, we believe the trial court's exclusion of this evidence operated to effectively preclude appellant from presenting his defense. *See id.* We therefore sustain his second and third issues. These constitutional errors are reviewable for harm under Texas Rule of Appellate Procedure 44.2(a), which requires us to reverse unless we are convinced, beyond a reasonable doubt, that they did not contribute to the jury's verdict. *See* Tex.R.App. P. 44.2(a). For the reasons enumerated above, we cannot say these errors did not contribute to appellant's conviction.

Although these errors alone are sufficient to reverse and remand this case, because of the pervasive nature of the errors apparent throughout appellant's trial, we continue our review of several of appellant's other issues to ensure that, upon remand, these errors are not repeated.

## C. Admission of Other Defendants' Convictions and Sentences and Improper Jury Argument

In his thirty-fifth, thirty-sixth, and thirty-seventh issues, appellant contends the trial court violated his constitutional rights and the law by permitting the State to inform the jury that other jurors had convicted Mayo and Pittman and sentenced them to confinement for life for their involvement in this child sex ring.[12] The disposition of a defendant's case is not admissible in the trial of a co-defendant. *Miller v. State,* 741 S.W.2d 382, 389 (Tex. Crim.App.1987) (en banc); *Torres v. State,* 92 S.W.3d 911, 917–18 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Appellant, Pittman, and Mayo were charged with overlapping offenses. Appellant was charged with engaging in organized criminal activity, with the predicate offenses being aggravated sexual assault of Shannon and Holden. Pittman was charged with aggravated sexual assault of Shannon and Holden. Mayo was charged with engaging in organized criminal activity with the predicate offenses being aggravated sexual assault of Shannon and Holden. These charges all stemmed from the same investigation, involving the same victims and similar proof. Thus, appellant, Mayo, and Pittman were effectively co-defendants in these three trials.

During its questioning of DFPS supervisor Kristi Hachtel, the State asked if Mayo and Pittman were "involved in this." Appellant's attorney objected on the basis of lack of personal knowledge and speculation. The trial court overruled the objection, and Hachtel testified that Mayo and Pittman were involved in and had been convicted for the same offense. Later, while questioning one of Shannon and Holden's foster parents, the prosecutor asked, "As long as we're on the lines of that previous testimony [the witness's testimony from the prior trials], those two individuals were convicted by a Smith County jury and sentenced to life in prison; is that right?"[13] Appellant objected on relevancy grounds, and the trial court overruled the objection.

---

12. The State knew that the conviction should not come into evidence unless the co-defendant testified. In the State's pre-trial motion in limine, the State requested that no mention be made about "the disposition of any case against co-defendants/accomplices, unless said co-defendant and or accomplice testifies."

13. Appellant had asked during cross-examination whether this individual had testified previously in the Mayo and Pittman trials, but did not go into the specifics of any of her testimony. But even if he had impeached the witness with prior testimony, this would not "open the door" to evidence of the convictions.

The fact that both Mayo and Pittman had been convicted and sentenced to life in prison for their acts had absolutely no place in appellant's trial. *See Miller,* 741 S.W.2d at 389–90; *Torres,* 92 S.W.3d at 917–18. The State's only defense to this improper questioning and to this evidentiary error is waiver. But appellant did not "open the door" for this information to be admitted into his trial, and he objected each time the State interjected the convictions and sentences of Mayo and Pittman into his trial.[14] Inexplicably, the trial court overruled his objections to this evidence and permitted the State to alert the jurors in appellant's trial that other jurors had convicted Mayo and Pittman for their involvement in the same child sexual exploitation scheme.[15] No case supports the trial judge's ruling. We therefore sustain appellant's thirty-fifth through thirty-seventh issues.

In issues thirty-eight and thirty-nine, appellant contends that his constitutional right to a fair trial was violated when the State was allowed to make impermissible closing arguments regarding the disposition of Pittman and Mayo's cases. Proper jury argument must fall within one of four general areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to opposing counsel's argument; and (4) pleas for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App. 1999).

Compounding the harm from the trial court's erroneous admission of appellant's co-defendants' convictions and sentences, the State emphasized those convictions in its closing argument. The trial court again permitted the State to interject these facts into appellant's trial over appellant's objection:

> MR. DAVIDSON: Your Honor, the Fifth Circuit ... says these specific kind of statements are designed to inflame and prejudice the jury. This is backed up by the case of Carter versus State, Court of Criminal Appeals of Texas. And this is way outside the proper jury argument by Go-

---

14. We thus disagree with the State's contention that appellant waived these complaints by failing to object.

15. The trial court apparently knew that such conviction evidence is inadmissible. When appellant's trial counsel asked Kemp whether appellant had been convicted of a felony, the following colloquy occurred:

> Q: (By Mr. Davidson) Does Patrick Kelly have a felony conviction?
> MR. MURPHY: Judge, I'm going to object as to relevance.
> THE COURT: The Court sustains the objection. Mr. Davidson, approach the bench just a minute.
> (At the bench, on the record.)
> THE COURT: What are you doing?
> . . .
> THE COURT: I'm telling you right now, you pull a stunt like that again, I'm going to have a contempt hearing on you. I'm going to tell you right now. The warning is on the record.

> You know that whether or not he has been convicted before or has not been convicted before is only going to be admissible under two circumstances. If he testifies and he has an impeachable offense, that's admissible.
> If he testifies or if you're proving eligibility for probation at sentencing, you may have accomplished what you wanted to accomplish, but you well know what you did is totally outside the rules, totally outside the rules of evidence.
> I'm going to instruct the jury to disregard that answer totally, because I know you know better, Mr. Davidson.
> Go have a seat. .
> MR. DAVIDSON: Yes, sir.
> (End of bench conference.)
> THE COURT: All right. Ladies and Gentlemen, the Court is going to instruct you to totally disregard Mr. Davidson's last question to the witness and any answer that was given.

mez versus State. This is prejudicing my client's right to a fair trial. It's denying him due process. It is depriving him of anything—

THE COURT: The Court's ruling is he's not doing any of those things. Your objections are overruled. He is making a closing argument to the jury. Your objections are overruled.

MR. DAVIDSON: These cases are talking about closing arguments.

THE COURT: Overruled.

The prosecutor proceeded as follows: "And you say three down, three to go. Three down, Jamie Pittman, Shauntel Mayo, Booger Red. Three to go, Jimmy Sones, Sheila Sones, Dennis Pittman. And you send a message to all of those other perverts—" Appellant objected and the trial court again overruled his objection.[16]

These statements were not the only inflammatory remarks made by the prosecutor during closing argument. For example, the prosecutor also stated, "If you think [these children are] lying, you tell me. If you think they made all of this up because it was fun, you tell me, and *we'll take them down and indict them,* and we'll say, 'Booger Red, we are so sorry.'" (emphasis added). Appellant's objection to the inflammatory and prejudicial nature of this argument was also overruled by the trial court.

■ The admission of the conviction evidence was error. The State's closing argument was improper. We must therefore review whether appellant's substantial rights were affected by the erroneously-admitted conviction evidence and improper argument. *See Brown v. State,* 270 S.W.3d 564, 572 (Tex.Crim.App.2008). In determining whether appellant's "substantial rights" were affected, we must balance the prejudicial effect of the argument, any curative measures, and the certainty of conviction absent the error. *See id.*

■ As noted above, we have not found a single case in which a trial court overruled an objection to such a comment on a co-defendant's conviction. The argument was clearly inflammatory. The argument occurred late in the State's final closing argument and likely left a strong impression on the jury. Thus, the prejudicial effect of the evidence and the argument was severe. Further, the trial court took absolutely no curative measures and instead overruled appellant's objections. *Cf. Guidry,* 9 S.W.3d at 154. And even an instruction to disregard will not cure remarks that are so inflammatory that their prejudicial effect cannot reasonably be removed by an admonishment to disregard. *See McKay v. State,* 707 S.W.2d 23, 37 (Tex.Crim.App.1985) (en banc). Although appellant might have been convicted ab-

---

**16.** The State suggests these statements were appropriate closing argument because the record shows that Mayo and Pittman were convicted. We agree the record reflects that Mayo and Pittman were convicted and sentenced to confinement for life. However, as discussed above, appellant objected to the admission of this evidence and the trial court inexplicably and erroneously overruled these objections. We thus disagree this argument was a **proper** "summation of the evidence." The State also asserts this argument was permissible as a response to appellant's argument. Specifically, the State contends that because appellant's counsel stated during closing, "I don't know whether Jamie and Shauntel ever did anything sexual with those kids or not[,]" it was appropriate for it to emphasize they had been convicted. We must disagree with this argument. Appellant's statement that he personally did not know whether Mayo and Pittman had sexually abused the children did not "open the door" to a response they had been convicted for their involvement in this child sexual exploitation ring. *See Brown v. State,* 270 S.W.3d 564, 572 (Tex.Crim.App.2008) (stating that, in responding to opposing counsel's argument, the State may not " 'stray beyond the scope of the invitation' " (quoting *Johnson v. State,* 611 S.W.2d 649, 650 (Tex.Crim.App. 1981))).

sent this improper argument, when we balance this factor against the prejudicial nature of the evidence and the prosecutor's arguments and the complete lack of curative measures taken to address the error, we are convinced that appellant's substantial rights were affected.

Under these circumstances, we conclude that these entirely inappropriate, prejudicial, and inflammatory evidence and remarks, to which appellant's repeated objections were overruled, constitute reversible error. We thus sustain appellant's thirty-eighth and thirty-ninth issues.

### D. Violations of the Rules of Evidence

#### 1. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Powell v. State*, 63 S.W.3d 435, 438 (Tex.Crim. App.2001). We will not disturb the trial court's ruling if it is "within the zone of reasonable disagreement." *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex.Crim.App. 2007). Instead, we will uphold the ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex.Crim.App.2002).

#### 2. The Case Was Tried by Hearsay.

In issues thirteen and seventeen, appellant asserts the trial court crafted an "investigator exception" to the hearsay rules, which permitted DFPS workers and police investigators to tell jurors what they heard from the children and other adults during their investigation. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX.R. EVID. 801(d). "Statements" include oral and written verbal expressions and non-verbal conduct of a person intended as a substitute for verbal expression. TEX.R. EVID. 801(a).

The State responds to these issues by asserting that appellant failed to preserve these complaints. The Court of Criminal Appeals has stated that "we should avoid splitting hairs when determining whether a claim has been procedurally defaulted." *Keeter v. State*, 175 S.W.3d 756, 760 (Tex.Crim.App.2005). To preserve error for appeal, a party needs to "let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* Finally, although a party generally must preserve error by objecting each time objectionable evidence is admitted, when a trial court has just overruled a valid objection to the same testimony, a defendant is not required to constantly repeat the objection. *Cardenas v. State*, 787 S.W.2d 160, 162 (Tex.App.-Houston [1st Dist.] 1990, pet. ref'd).

Appellant's trial counsel made repeated and exhaustive objections to this testimony, asserting it was hearsay; it violated the Confrontation Clause; the prosecutor was leading the witness; the testimony constituted improper bolstering; the witness lacked personal knowledge; the witness was speculating; and the questions called for legal conclusions. Other than occasionally instructing the prosecutor to stop leading a witness, the trial court repeatedly overruled these objections. The appendix attached to this opinion contains several excerpts of trial testimony, showing the type of objections made and the trial court's rulings on these objections. As is made clear by these excerpts, the trial court was not interested in entertaining appellant's hearsay objections. Thus, appellant preserved these issues for our review.

The State also responds that the trial court did not err by permitting

DFPS workers and Kemp to testify regarding what they heard from the children and adults during their investigation because this testimony was admissible as "prior consistent statements." Under Texas Rule of Evidence 801(e)(1)(B), statements that are consistent with the declarant's testimony and offered to rebut an express or implied charge against the declarant of *recent* fabrication or improper influence or motive are not hearsay. Tex.R. Evid. 801(e)(1)(B). To fall within this hearsay exception, the prior consistent statement must have been made before the improper influence or motive arose. *See Haughton v. State*, 805 S.W.2d 405, 407–08 (Tex.Crim.App.1990). But the State acknowledges that appellant's trial strategy was to show that the Cantrells abused the children in their care and that, to divert attention from their own wrongdoing, they pressured the children to falsely accuse appellant.[17] Because appellant contends that those accusations—*i.e.*, the children's outcries after being placed with the Cantrells—were the result of the Cantrells' improper influence, a statement by one of the children could not be a *prior* consistent statement unless it was made before the children began living with the Cantrells. Here, however, it is undisputed that none of Shannon and Holden's out-of-court statements characterized by the State as prior consistent statements were made before the children were placed with the Cantrells. Thus, the repetition of these statements made by those other than the declarants testifying at trial, which were offered for the truth of the matter asserted therein, was quite clearly inadmissible hearsay.[18] *See* Tex.R. Evid. 801(d). As the excerpted testimony in the appendix to this opinion demonstrates, numerous witnesses testified regarding the statements the children had made to them (hearsay), as well as statements made to them by other witnesses regarding what the children had said to these other witnesses (hearsay within hearsay). Appellant's trial counsel objected repeatedly to this testimony, yet the trial court repeatedly overruled these objections.

The trial court clearly abused its discretion in overruling appellant's repeated hearsay objections. In so doing, these witnesses were permitted to repeat the children's allegations as facts; fill the gap left by the failure of Shannon and Holden's outcry witness, Margaret Cantrell, to testify; and describe the sordid details of the alleged child sex ring as if they were personally aware of it. We therefore sustain

---

17. Generally, an appellant must have objected on the ground that the prior statement did not predate the improper influence or the motive to fabricate to preserve that argument for appeal. *Bolden v. State*, 967 S.W.2d 895, 899 (Tex.App.-Fort Worth 1998, pet. ref'd). But "[w]hen the correct ground for exclusion was obvious to the judge and opposing counsel, no forfeiture results from a general or imprecise objection." *Resendez v. State*, 306 S.W.3d 308 (Tex.Crim.App.2009). On this record, we have no doubt that the prosecutor and the trial court were aware that this was the basis of defense counsel's hearsay objections to this testimony.

18. We note the trial court appeared to be operating under the mistaken impression that, so long as "Witness A" testified at trial, it was permissible for "Witness B" to repeat statements made by "Witness A." The trial court's fundamental misunderstanding of what constitutes hearsay is exemplified by the following comment made in response to the State's hearsay objection when appellant's counsel was cross-examining Ranger Kemp, "What I'll let him testify to is what his interviews with these children, who are all going to be testifying or have already testified in the case. I'm going to sustain the objection, *unless it's based on something that he's talked to the children about.*" (emphasis added). This misapprehension seemed to work almost entirely to appellant's detriment, however, because the majority of the State's hearsay objections were sustained.

appellant's thirteenth and seventeenth issues.

### 3. Hachtel Was Not Qualified as an Expert.

In his fifteenth issue, appellant argues the trial court permitted DFPS worker Kristi Hachtel to testify as an expert in violation of Texas Rule of Evidence 702. Specifically, appellant asserts that Hachtel testified as an expert "in the fields of: (1) child sexual predator techniques, and (2) determining the truthfulness of children's sexual abuse allegations." Rule 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702.

 Before admitting expert testimony, a trial judge must determine whether (1) the witness qualifies as an expert through knowledge, skill, experience, training or education, (2) the subject matter of the testimony is appropriate for expert testimony, and (3) admitting the evidence will assist the finder of fact. *Vela v. State,* 209 S.W.3d 128, 131 (Tex. Crim.App.2006). The State did not designate Hachtel as an expert. Before she testified, appellant sought a *Daubert* [19] hearing on her qualifications to testify regarding the "grooming process" used by child predators. The trial court denied this request. Over appellant's objections that she was not qualified as an expert, Hachtel testified in detail regarding the "grooming process" of child sexual predators and described numerous medical details of child sexuality.

First, we note that Hachtel was a non-medical witness. *Cf. Gregory v. State,* 56 S.W.3d 164, 179–80 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd) (stating that nurses and other medical professionals may be qualified as experts in evaluating child abuse cases, although a medical license or degree is not "the litmus test" for qualification as an expert); *Perez v. State,* 25 S.W.3d 830, 837 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (concluding the trial court abused its discretion in permitting non-medical witness to testify about findings made by pediatric psychiatrist regarding "child abuse accommodation syndrome"). During cross-examination of Hachtel, appellant elicited the fact that Hachtel had not received any training in psychology beyond an associate's degree. Hachtel agreed that she was not a licensed professional counselor or psychologist, had not attended medical school, and was neither a nurse nor a sexual assault nurse examiner.

 Although Hachtel's lack of medical training is not dispositive of her qualifications to testify as an expert on the "grooming process" used by child predators, her testimony was predicated on detailed medical information. For example, her testimony began as follows:

> In girls, in what we call prepubescent girls, after the age of 18 to 24 months, they lose the estrogen that was transferred to them through birth.
>
> And so in the vaginal area, the hymen, which is a circle of tissue that surrounds the vaginal opening but does not cover, becomes very thin and very tender to the touch.... And the hymen is still like that until estrogen comes back on board when a female child reaches menses or

---

**19.** *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

the time in which she gets her menstrual cycle.

. . .

One of the things you have to know is that all the sexual organs of both males and females is [sic] intact, even when they're babies, even when they're two, three, seven, eleven. The clitoris is intact. It has the same sensations as that of an adult female.

For the male, they can have an erection, the stimulation of the glans in the head of a penis, the same sensations that a male would feel.

And although children don't know that they have stimulation of those sexual organs, that it's called an orgasm, the sensations are still the same. There's still that tingly feeling. It's a positive feeling.

Now that goes in contrary when the adult—others out there go, oh, sexual abuse, that must be bad, painful. That's kind of in conflict, because a perpetrator is grooming. They will desensitize.

Appellant's trial counsel renewed his objection to Hachtel's testimony, arguing that she was "giving testimony as if she were a physician," and again requested a *Daubert* hearing. The trial court again denied this request, and there is absolutely nothing in the record that indicates Hachtel has the training, background, knowledge, experience, or education to provide such medical testimony. *Cf.* Tex.R. Evid. 702; *Vela*, 209 S.W.3d at 131. Moreover, even if she were qualified as an expert, it was not proper for her to testify that the victims in this case were being truthful.[20] *E.g., Lane v. State*, 257 S.W.3d 22, 27

(Tex.App.-Houston [14th Dist.] 2008, pet. ref'd) ("Because it is jurors who must decide the credibility of the parties in issue, expert opinions on the truthfulness of a child complainant's allegations or that a class of persons the complainant belongs to is truthful[ ] are prohibited." (citing *Yount v. State*, 872 S.W.2d 706, 708, 710–12 (Tex. Crim.App.1993) (op. on reh'g))).

The trial court abused its discretion in allowing Hachtel to testify as an expert. We therefore sustain appellant's fifteenth issue.

**4. The Testimony of Appellant's Expert Witness Was Limited, but the Testimony of the State's Expert Witness Was Not.**

 In his twenty-sixth and twenty-seventh points of error, appellant argues that the testimony of his expert, Dr. Michael Ferrara, was restricted in violation of Texas Rule of Evidence 704 and the Due Process Clause, while the testimony of the State's expert witness was not limited and other witnesses for the prosecution were permitted to testify to the truthfulness of the children's allegations. Specifically, appellant complains that his expert was not allowed to testify that the children's allegations were scientifically unreliable and that the allegations of abuse were false.

 We have previously held that no expert witness may testify that a child complainant's allegations are true. *E.g., id.* An expert witness also is prohibited from testifying that a child's allegations are false. However, a qualified expert may answer a hypothetical as to whether

---

**20.** Numerous other witnesses also testified that they believed the children were being truthful. However, appellant did not always object to this testimony, nor did he object to Hachtel's statements that she believed the children were being truthful.

Both the State and the trial judge knew that it was improper for a witness to testify that the children were telling the truth. The trial judge twice sustained the State's objection during the cross-examination of Kemp as to whether or not what Shannon said was truthful or accurate.

particular interviewing techniques can lead to false accusations.

 The trial court allowed the State much more leeway in the examination of its own expert, Dr. Gayle Burress. It was error for the trial court to overrule an objection as to whether the **testimony** of a child was "consistent with child abuse." It was error for the judge to overrule an objection to a question as to "whether there was grooming in this case." Both of those questions asked the expert to give her opinion as to whether the testimony of the children was true. *See id.* Certainly Dr. Burress could testify as to what constitutes "grooming," and she could answer a hypothetical as to whether showing masturbation techniques with dolls is a type of grooming. But the trial court should not allow the prosecutor to testify and argue in his hypothetical. For example, the following question is a completely improper hypothetical and the court should have sustained appellant's objection:

> In a hypothetical case where children are forced to engage in sexual intercourse with one another, where multiple children are forced to strip down and dance naked and act out in sexual plays and fantasies ... would you expect to see grooming?

And Dr. Burress should not have been allowed to imply that the children were telling the truth by claiming she would not have agreed to be a witness in the case if she saw evidence of deception. We therefore sustain appellant's twenty-sixth and twenty-seventh points of error.

### 5. These Evidentiary Errors Caused Harm.

 In determining harm in *Harris v. State*, 790 S.W.2d 568, 587–88 (Tex.Crim. App.1989), the court concluded:

> In summary, a reviewing court in applying the harmless error rule should not focus upon the propriety of the outcome of the trial. Instead, an appellate court should be concerned with the integrity of the process leading to the conviction. Consequently, the court should examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications ... [T]he reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making ... In other words, a reviewing court must always examine whether the trial was an essentially fair one.

Applying this test to the improperly admitted evidence here leads us to the conclusion that harm occurred. Although the children themselves did testify regarding many of the same facts, allowing Kemp and the DFPS witnesses to summarize their testimony and to testify as if they had personal knowledge of the facts must certainly have influenced the jury in their decision. Appellant's trial counsel was not permitted to adequately defend appellant when his expert's opinion was curtailed, while the State's expert was allowed to bolster the children's testimony with her own opinion of their truthfulness.

### E. Violation of the Confrontation Clause

#### 1. Testimonial Statements from Absent Witnesses Were Improperly Admitted.

 Appellant argues in his tenth, fourteenth, sixteenth, and nineteenth issues that the trial court violated the Confrontation Clause and *Crawford v. Washington* [21] by permitting DFPS workers and

21. 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Kemp to testify about statements made to them by the children, their various foster parents, and other DFPS workers during their investigations into the children's allegations. The Confrontation Clause of the Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. Amend. VI. The Confrontation Clause is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403–05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The primary concern of the Confrontation Clause is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Even if a statement offered against a defendant is admissible under evidentiary rules, the statement may implicate the Confrontation Clause. *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex.Crim. App.2006). In brief, the Confrontation Clause bars the admission of testimonial statements of witnesses who do not appear at trial, unless they are unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 53–54, 124 S.Ct. 1354.

Much of the DFPS workers' testimony concerned information that clearly was learned from other sources. For example, DFPS worker Amy McDonald testified, over appellant's hearsay and Confrontation Clause objections, that she was "informed" by Shannon and Holden's "foster parents" that the children had watched movies with "naked people" in them. McDonald testified that there was a sexual incident between Holden and another boy at his first foster home. Yet Mr. Howard, the first foster father, did not testify to this incident. Likewise, appellant's Confrontation Clause objections to McDonald's response

to questions regarding whether she "learned" through her investigation that appellant was involved in abusing the children were overruled.

DFPS witness Hunter testified to sexual acting-out in the Cantrell's home, including Cathy's masturbation to the point of bleeding and Shannon's masturbation and over-sexualized behaviors with men. She could have gained this information only from Margaret or John Cantrell. She was permitted to combine all of the children's versions of events into a single story, but some of the children did not make all these allegations. She further was permitted to testify that this was a "continuing pattern of sexual abuse" perpetrated by the defendants.

During the testimony of DFPS supervisor Hachtel, the trial court overruled appellant's objections to hearsay and violation of the Confrontation Clause and allowed Hachtel to testify that Shannon's "foster parent" noted that Shannon had performed a type of strip tease dance. No foster parent testified in support of this statement. Hachtel also testified, over appellant's Confrontation Clause objections, that once Shannon and Holden began to "feel safe" they began making statements to their foster parents and DFPS workers about their sister, Cathy. It was undisputed that the first outcry by Shannon and Holden occurred after they went to live with the Cantrells. And it is undisputed that the Cantrells did not testify. Hachtel testified that Cathy's masturbation was excessive and abnormal for a five-year-old and that she bled. Again, this information was not based on anything that she saw but could be based only on what Margaret Cantrell told her. Hachtel repeated the children's stories as fact and identified appellant as part of a child exploitation ring.

The DFPS witnesses repeatedly stated that Ginny did not have contact with Shannon, Holden, and Cathy while they were at the Cantrell home, yet Ginny's story was consistent with theirs. Hachtel testified there was no contact at all between the children. Hunter stated that they had no contact until shortly before the first trial in March 2008. This testimony was not based on personal knowledge, and other testimony contradicted these claims. In November 2005, Ginny told her first foster mother that her grandmother, Virginia Mayo, was lying about what had happened. Ginny reported that her grandmother said that Shannon, Holden, and Cathy had to dance in front of boys at a strip club. There was also a physical meeting of the children: Ginny had a play date with Shannon, Holden, and Cathy at the time of Ginny's first interview in August of 2006, when Ginny originally denied all allegations. Sometime later, she told her foster mother that everything that Shannon, Holden, and Cathy said was true. Clearly, someone was telling Ginny what Shannon, Holden, and Cathy were saying. Shannon also testified that she talked to Ginny on the phone many times. It was not until January or February of 2008 that Ginny corroborated what the other children said.

Kemp also testified at length regarding what he "learned" through his investigation, *i.e.* that Cathy was masturbating excessively; that Shannon and Holden's sexual organs were in contact; and that appellant was involved in criminal activity for profit with numerous other defendants. Appellant made frequent objections to this testimony, including multiple objections to hearsay testimony and Confrontation Clause violations. The trial court overruled all these objections.

The State responds to these issues by asserting that these statements were admissible as prior consistent statements.

First, many of these "facts" did not come from the children and could not be prior consistent statements. Second, this response does not address appellant's complaints regarding violations of the Confrontation Clause. *See Gonzalez,* 195 S.W.3d at 116 (Tex.Crim.App.2006). Third, as discussed above in section III. D.2, statements by the children after they were placed with the Cantrells do not qualify as prior consistent statements because appellant's defensive theory was that the Cantrells coached the children into making these allegations. The State further responds by asserting that appellant failed to preserve these complaints. But for the reasons discussed *supra* in section III.D.2, we conclude these complaints were preserved.

In the face of appellant's repeated Confrontation Clause objections, it was the State's burden to establish the statements were admissible under *Crawford. See De La Paz v. State,* 273 S.W.3d 671, 680–81 (Tex.Crim.App.2008). The State failed to do so at trial and has failed to do so in its brief.

■ The hearsay repeated by Kemp and the DFPS workers was collected as part of an investigation into the children's allegations. It is difficult to see how these statements were not testimonial in nature. Although many of these witnesses may have testified at appellant's trial,[22] neither Margaret nor John Cantrell testified. Several of the DFPS workers referred simply to learning things from "foster parents," without specifying from which foster parents they learned the information, even in the face of appellant's Confrontation Clause objections. Any information that these witnesses discovered through interviews or conversations with the Cantrells should not have been admitted without the

---

**22.** *See Crawford,* 541 U.S. at 53–54, 124 S.Ct. 1354

State showing the Cantrells were unavailable *and* that appellant had a prior opportunity to cross examine them. *See Crawford,* 541 U.S. at 53–54, 124 S.Ct. 1354. Although the fact that the Cantrells asserted their Fifth Amendment privileges obviated the need for the State to show that they were unavailable, there is absolutely no showing in the record that appellant had a prior opportunity to cross examine the Cantrells.

In sum, we conclude that, in the face of repeated objections based on the Confrontation Clause, the trial court did not act to ensure that appellant's right to confront the witnesses against him was protected. "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68–69, 124 S.Ct. 1354. We thus sustain appellant's tenth, fourteenth, sixteenth, and nineteenth issues.

**2. Violations of the Confrontation Clause Harmed Appellant.**

The violation of a defendant's right of confrontation is subject to a harmless-error analysis. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). We must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to it. TEX.R.APP. P. 44.2(a). As detailed above, the emphasis of a harm analysis is not the propriety of the trial's outcome but the integrity of the process that led to the conviction. *Harris,* 790 S.W.2d at 587.

When evaluating harm, we consider: (1) the statement's importance to the State's case; (2) whether the statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the statement on material points; and (4) the overall strength of the State's case. *Scott v. State,* 227 S.W.3d 670, 690 (Tex.Crim.App. 2007). We may also consider the source and nature of the error, the amount of emphasis by the State on the statement, and the weight that a juror would probably give it. *Id.* Finally, we presume that the damaging potential of any cross-examination would have been fully realized had the witness been present to testify. *Baldree v. State,* 248 S.W.3d 224, 231 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd).

As discussed above, much of the hearsay information had to have come from the Cantrells; the Cantrells believability was essential to the State's case; and the defense was prevented from presenting appellant's defensive theory about the Cantrells. These factors lead us to the inevitable conclusion that harm resulted from these violations of appellant's right to confront the witnesses against him.

**IV. Conclusion**

Although the evidence in this case is legally sufficient to support appellant's conviction, the record is rife with error. We have sustained appellant's complaints that he was prevented from presenting his defense, and we cannot conclude, beyond a reasonable doubt, that these errors did not contribute to appellant's conviction. We have further concluded that many of appellant's other complaints are meritorious. In fact, our review of the record supports appellant's contentions that the trial court adopted *ad hoc* evidentiary rules that operated to assist the State in proving its case, while impeding appellant's ability to defend himself. Many of these errors did affect appellant's substantial rights. For the foregoing reasons, we reverse and remand for a new trial.

## APPENDIX: EXCERPTS
## FROM RECORD [23]

*Direct Examination of Amy McDonald,*
*Smith County DFPS Employee, not des-*
*ignated as an outcry witness*

Q. What types of issues were arising at the foster home?

A. Just a few days after placement, there was an incident between [Holden] and the other little boy that lived in the foster family's home.

MR. DAVIDSON: Objection, hearsay; lack of personal knowledge.

THE COURT: The objection is overruled.

Q. (By Mr. Murphy) Was that incident sexual in nature.

A. Yes.

*On re-direct:*

Q. (By Mr. Murphy) Based on your training and experience, based upon your involvement in this case, is there any doubt in your mind about the defendant's culpability?

MR. DAVIDSON: Objection, calls for speculation and also lack of personal knowledge.

THE COURT: Overruled.

A. Sorry. Can you ask the question—

Q. (By Mr. [Murphy]) Is there any doubt in your mind that—just as Jamie Pittman and Shauntel Pitman (sic) have been found guilty by a jury, is there any doubt in your mind that the defendant is also just as guilty as they are?

A. No.

Q. No, he is not, or, no, there's no doubt in your mind?

A. No doubt in my mind.

Q. Why did if give you concern—when [Cathy] started talking about wearing costumes and dancing and jumping, why did that give CPS concern?

A. [Shannon] had already started to give information that the children—

MR. DAVIDSON: Objection, hearsay, Your Honor; objection, violation of the confrontation clause.

THE COURT: Both of those objections are overruled.

Go ahead, ma'am.

A. Okay. That the children were given costumes of what she described as a panty and bra set and allowed—made to dance on a stage.

MR. DAVIDSON: Your Honor, I have to raise the same objections again. I can ask for a running objection.

THE COURT: The same ruling by the Court, and I'll give you a running objection as to this witness so she can go ahead with her testimony.

Q. (By Mr. Murphy) Go ahead.

A. [That] she was made to dance for money.

MR. DAVIDSON: Same objection, Your Honor.

THE COURT: Do you want the running objection or—

MR. DAVIDSON: I have—I think I have to keep repeating.

THE COURT: Your objections are all overruled.

Go ahead, ma'am.

A. And at that time, she had already started to give the information about hav-

23. As noted above, Thad Davidson and Tina Brumbelow represented appellant at trial; the State was represented by Joe Murphy and Jason Parrish.

ing to wear the costumes and the costumes had been burned.

MR. DAVIDSON: Objection, violation of confrontation clause against my client, Article I, Section 10 of the Texas Constitution, Sixth Amendment of U.S. Constitution, and hearsay without exception.

THE COURT: All of those objections are overruled, Mr. Davidson.

. . .

Q. (By Mr. Murphy) Ms. Hunter, you said that there were concerns because of allegations—or excuse me—because of what [Shannon] was beginning to say regarding dancing and costumes.

A. Correct.

Q. Were y'all given information as to what happened to those costumes?

A. Yes.

MR. DAVIDSON: Objection, hearsay; violation of the confrontation clause.

THE COURT: Those objections are overruled.

Q. (By Mr. Murphy) What happened to those costumes?

MR. DAVIDSON: Lack of personal knowledge on the part of this witness.

THE COURT: That objection is overruled.

Q. (By Mr. Murphy) What happened to those costumes?

A. [Shannon] stated they were burned.

Q. And did she tell y'all where they were burned?

A. Yes.

Q. Where were they burned?

MR. DAVIDSON: Objection, again, Your Honor. I have to raise the same objections. This is hearsay without exception.

THE COURT: Same ruling by the Court.

Q. (By Mr. Murphy) Where were they burned?

A. They were burned on Mr. Kelly's property.

. . .

Q. Now, was there any—once they were in the Cantrells' home talking about all three of them together now—

A. Okay.

Q.—was there any sexual acting out within the Cantrells' home?

MR. DAVIDSON: Objection, lack of personal knowledge; objection, calls for speculation; objection, violation of confrontation clause, U.S. Sixth Amendment, Article I, Section 10, Texas Constitution.

THE COURT: Same ruling by the Court. Overruled.

A. Yes.

Q. (By Mr. Murphy) Let's start with [Cathy]. What type of sexual acting out was [Cathy] doing in the Cantrell home?

A. [Cathy] was masturbating to the extent of bleeding.

Q. Would she do this frequently?

A. Yes.

Q. Would she do it just about everywhere?

MR. DAVIDSON: Objection, leading.

THE COURT: Sustained. Don't lead the witness.

Q. (By Mr. Murphy) What types of places would [Cathy] masturbate?

A. [Cathy] would masturbate at home.

Q. Would she ever masturbate, to your knowledge—

MR. DAVIDSON: Objection, leading again, Your Honor.

MR. MURPHY: I'm sorry, Judge, but I'm not finished with my question.

THE COURT: I know. Go ahead and finish it.

Q. (By Mr. Murphy) To your knowledge, would she masturbate anywhere other than the home?

A. No.

Q. How old was [Cathy]?

A. [Cathy] was five.

A. Why is it that—a five-year-old who would masturbate until she bled, what about that gave you concern?

MR. DAVIDSON: Objection, Your Honor, calls for speculation. Neither has this witness been qualified as a medical expert or a psychological expert in the treatment of kids.

THE COURT: All those objections are overruled.

You can answer the question, ma'am. Go ahead.

A. Rephrase the question.

Q. (By Mr. Murphy) What is it about a five-year-old girl who says that she wears costumes and jumps up and down and people get money when she's first placed in her first foster home?

MR. DAVIDSON: Objection, leading, Your Honor.

THE COURT: That objection is overruled.

Q. (By Mr. Murphy) What about her masturbating until she bled gave you concern?

A. The extent of the masturbation was the concern. Most children masturbate but not to the extent of bleeding.

Q. What about [Shannon]? Did she act out sexually in any way?

A. [Shannon] would also masturbate, but she had extreme—

MR. DAVIDSON: Objection, lack of personal knowledge; calls for specula-tion; witness is not qualified as an expert.

THE COURT: Those objections are overruled.

Go ahead and start your answer again. Just start over. Thank you.

THE WITNESS: Okay.

A. [Shannon] would masturbate as well, and she also had very over-sexualized behaviors toward adult men.

Q. What do you mean by that?

A. She would just come and sit in their laps, someone that she just met that day. She would swing her hair and just get really close to adult men, make them rather uncomfortable.

. . .

Q. As time went on, were you made aware as to whether or not Patrick "Boo-ger Red" Kelly was involved in this abuse?

MR. DAVIDSON: Objection, lack of personal knowledge; calls for speculation; calls for hearsay; also, violation of confrontation clause, Sixth Amendment of the U.S. Constitution, Article I, Section 10, Texas Constitution.

THE COURT: Those objections are overruled.

Ma'am, you may answer the question.

A. Yes.

Q. (By Mr. Murphy) When we say involved, what's kindergarten?

MR. DAVIDSON: Objection, lack of personal knowledge, Your Honor.

THE COURT: The objection is overruled, Mr. Davidson.

Ma'am, go ahead and answer the question.

A. Kindergarten is a time where the children are trained by the adults how to perform the sexual dancing and the sexual acts starting at age five.

Q. (By Mr. Murphy) From your knowledge of this case, was Booger Red involved in kindergarten?

A. Yes.

MR. DAVIDSON: Objection, lack of personal knowledge; also violation of confrontation clause against my client; also calls for hearsay.

THE COURT: Those objections are all overruled.

Q. (By Mr. Murphy) After kindergarten, that included but it wasn't limited to him, was it?

A. No.

Q. After that, where would the kids go?

A. They would dance on stage.

MR. DAVIDSON: Your Honor, objection, lack of personal knowledge by this witness.

Number two, objection, calls for speculation by this witness.

Number three, repetitive testimony.

Number four, this would be in violation of the confrontation clause, Sixth Amendment, U.S. Constitution; Article I, Section 10 of the Texas Constitution.

THE COURT: Those objections are overruled.

You may answer the question.

A. They would be—they would dance on stage. [Shannon] would dance with her mother.

MR. DAVIDSON: Your Honor, objection. This is improper bolstering of previous child testimony.

MR. MURPHY: Judge, it's a prior consistent statement.

THE COURT: Overruled.

A. She would dance with her mother and another woman that she said has dark brown hair. [Holden] would be made—they would be made to play doctor.

Q. (By Mr. Murphy) [Holden] and [Shannon]?

A. [Holden] and [Shannon].

MR. DAVIDSON: Your Honor, I have to object. This is a violation of the confrontation clause, Sixth Amendment, U.S. Constitution; Article I, section 10, Texas Constitution.

This witness has no personal knowledge of this. This witness is testifying about events that she has not personally seen or witnessed or knows about. It's a violation of the confrontation clause.

THE COURT: All of those objections are overruled.

. . .

Q. They would play—I believe your testimony was that they would play doctor, [Holden] and [Shannon].

A. Correct.

Q. Siblings?

A. Yes.

Q Did doctor include their privates touching one another?

A. Yes.

Q. The whole time they were being brought to that club, did they reside here in Tyler?

A. Yes.

Q. So they were leaving Tyler after kindergarten to go to the club

MR. DAVIDSON: Your Honor, objection, lack of personal knowledge on the part of this witness.

And, number two, calls for speculation on the part of this witness.

Number three, violation of the confrontation clause on both the Sixth Amendment of the U.S. Constitution and Article I, Section 10 of the Texas Constitution.

THE COURT: Same ruling by the Court on all the same objections.

Q. (By Mr. Murphy) So they were brought from Tyler, Smith County, Texas, to that club to perform?

A. Correct.

Q. What would the kids get for performing?

A. Food.

MR. DAVIDSON: Again, Your Honor, lack of personal knowledge.

THE COURT: Same ruling by the Court. Overruled.

Q. (By Mr. Murphy) I'm going to lump them all together. What would the grownups get?

MR. DAVIDSON: Again, Your Honor, objection, lack of personal knowledge; calls for hearsay; violation of the confrontation clause.

THE COURT: Overruled.

Q. (By Mr. Murphy) What would the grownups get?

A. Money.

Q. When we say "the grownups," does that group include Patrick "Booger Red" Kelly?

MR. DAVIDSON: Your Honor, objection, leading; and also calling for—this lack of personal knowledge on the part of the witness; calls for speculation about—from the witnesses; and finally hearsay.

THE COURT: All those objections are overruled, except to the leading.

Don't lead her, Mr. Murphy.

MR. MURPHY: Yes, sir.

Q. (By Mr. Murphy) Was Patrick "Booger Red" part of that group?

A. Yes.

Q. Was Jamie Pittman part of that group?

A. Yes.

Q. Was Shauntel Mayo part of that group?

A. Yes.

MR. DAVIDSON: Objection, leading, Your Honor.

THE COURT: Overruled.

Q. (By Mr. Murphy) Was Dennis Pittman part of that group?

A. Yes.

A. Was Jimmy Sones part of that group?

Q. Yes.

MR. DAVIDSON: Objection, lack of personal knowledge on the part of this witness to any of the questions that the District Attorney just asked this witness.

THE COURT: Same ruling by the Court as on all your other objections, Mr. Davidson. They're overruled.

Q. (By Mr. Murphy) And was Sheila Sones part of that group?

A. Yes.

Q. Based on your knowledge and CPS involvement in this case, was this a continuing course of sexual abuse?

MR. DAVIDSON: Objection, calls for speculation. Also asks this witness to make a legal opinion, which she is not qualified to do. She's not a lawyer, and she's not a judge.

THE COURT: That objection is overruled.

Q. (By Mr. Murphy) Was this a continuing pattern of sexual abuse on [Shannon], [Holden], and [Cathy]—

MR. DAVIDSON: Objection, leading.

THE COURT: Overruled.

Q. (By Mr. Murphy)—perpetrated by the defendant in the group that we just named?

A. Yes.

. . .

Q. From the time they were re-moved—from the time [Shannon] and [Holden] were removed from Shauntel and Jamie Pittman's house up until recently, did they have any contact with [Ginny]?

A. No.

MR. DAVIDSON: Objection, lack of personal knowledge on the part of this witness; calls for speculation; calls for hearsay.

THE COURT: Overruled.

You can answer the question.

A. No, they did not.

. . .

Q. (By Mr. Murphy) Did [Ginny] also give CPS a version of the events as to what occurred not only in kindergarten but also the Mineola swingers' club?

A. Yes.

Q. Was her version of events consistent with what [Shannon], [Holden], and [Cathy] said?

MR. DAVIDSON: Objection, Your Honor. Lack of personal knowledge on the part of this witness; violation of confrontation clause; calls for hearsay.

THE COURT: It's all overruled.

[No answer]

Q. Was there any influence by one group or the other in this case?

MR. DAVIDSON: Objection, calls for speculation on the part of the witness; objection, lack of personal knowledge on the part of witness; objection, violation of the confrontation clause against Patrick Kelly, Sixth Amendment, U.S. constitutional right, and Article I, Section 10 of the Texas Constitution.

THE COURT: The objections are overruled.

You may answer the question.

A. No. Not to my knowledge, no.

Q. (By Mr. Murphy) Do you think this is just a false allegation?

A. No, I do not.

Q. Is there any doubt in your mind about that?

A. No.

*Direct Examination of Kristi Hachtel, DFPS Supervisor, not designated as an outcry witness*

Q. (By Mr. Murphy) What types of red flags did y'all notice with [Shannon] before her outcries?

A. That she would hush [Holden] up if he was talking and tell him that "we don't talk about that." When she was in the foster home and doing a princess dance—

MR. DAVIDSON: Your Honor, again, objection, hearsay, lack of personal knowledge on the part of this witness.

THE COURT: That's the same objection I already ruled on. If there's any question about it, it's overruled again. Go ahead.

Q. (By Mr. Murphy) What about the princess dance was a red flag?

A. What the foster parent noted was that while the other girls were pretending to be a princess and do ballet, [Shannon] had adjusted her—

MR. DAVIDSON: Your Honor, objection, again, hearsay, violation of the confrontation clause.

THE COURT: Here's the way we're going to do it, Mr. Davidson.

MR. DAVIDSON: Yes, sir.

THE COURT: You're constantly interrupting the witness. I want you to have every opportunity to object. If

you'll go ahead and lodge your objection after Mr. Murphy asks the question, then I'll rule on the objection.

Unless it gets in some area beyond that question, you know, the witness needs to be able to finish her testimony. You can object whenever you want to, but if I overrule the objection and then allow her to answer the question, then unless it goes into some totally different area where I have not already ruled, she needs to be able to finish her answer. But you object whenever you want to.

MR. DAVIDSON: Yes, sir.

THE COURT: Go ahead, Mr. Murphy.

Q. (By Mr. Murphy) What about the princess dance was the red flag based on your training and experience?

MR. DAVIDSON: Objection, Your Honor. At this time, the witness has no personal knowledge. The witness did not witness this. This is calling for hearsay, speculation, and violation of confrontation clause.

THE COURT: Those objections are all overruled. Let's see if we can go ahead now—all the objections are overruled.

Q. (By Mr. Murphy) What part about the princess dance was a red flag based on your training and experience?

A. She had gone into a repertoire that was consistent with a striptease or pole dance.

Q. How old was she?

A. I believe she was seven.

Q. Was that the only time she went into that striptease—excuse me—or pole dance routine?

MR. DAVIDSON: Your Honor, objection. Same objections that I just made previously.

THE COURT: Same ruling by the Court, Mr. Davidson. They're overruled.

A. I'm aware of only that one.

. . .

Q. (By Mr. Murphy) You talked about [Cathy]'s masturbation. I guess for lack of a better term, was that a normal exploration by a five-year-old of their own body?

A. No.

Q. Why do you say that?

A. Most children, in normal exploration of their own body, will have clothes on, and they figure out they've got body parts down there, and those body parts have some feelings, so there will be some light stroking. They may ask you about it.

When a child will disrobe and make gestures to accurately place fingertips or other objects directly on the clitoris and do larger stimulation, that is not normal. That's beyond what is a normal kid figuring out that they have body parts and what those body parts are. It's much more than an exaggerated stimulation.

Q. How would you describe [Cathy]'s masturbation?

MR. DAVIDSON: Again, Your Honor, objection, lack of personal knowledge on the part of this witness.

THE COURT: The objection is overruled.

A. Excessive.

Q. (By Mr. Murphy) Why would you describe it as excessive?

A. Because it was all the time most—it was all the time. I mean, most kids, maybe when they're taking a bath or they've got their jammies on or their little gown on, you know, sitting there watching TV, and, wow, it's there.

It was all the time. It was—it was not normal. It was all the time. It was excessive. It was out in public. It was—this isn't something private that I'm going to do behind closed—you know, behind—or when I'm in my bed or something like that.

It was—it's the only way I can say it was all the time.

Q. Did she ever masturbate until she bled?

MR. DAVIDSON: Objection, leading.

THE COURT: Overruled as to that question.

A. Yes.

Q. (By Mr. Murphy) Is that normal for a five-year-old?

A. I don't think it's normal for anybody.

Q. And based on your training and experience, is that learned behavior?

A. Yes, sir.

Q. Based on your training and experience, where did she learn this behavior?

MR. DAVIDSON: Objection, calls for speculation on the part of the witness, and the witness has no personal knowledge.

THE COURT: I'll sustain that objection.

You can rephrase that question, Mr. Murphy.

Q. (By Mr. Murphy) Through your CPS investigation, was [Cathy] taught this behavior?

A. Yes, sir.

Q. Based on your CPS investigation that you supervise, who taught [Cathy] this behavior?

MR. DAVIDSON: Again, same objection that I just made, Your Honor.

THE COURT: Same ruling by the Court, overruled.

A. [Cathy] was in a child sexual exploitation ring and was taught by Jamie Pittman, Shauntel Mayo, Booger Red, Mr. Patrick Kelly, and Dennis Pittman.

. . .

Q. Anything that—let's start with [Shannon]. Anything that [Shannon] told you or other CPS workers or that you're aware of, were you concerned about the veracity of that at all?

A. No.

Q. What about [Holden] or [Cathy]?

A. None.

Q. Are you aware as to whether or not [Ginny] made any outcries?

A. Yes, I am.

Q. And did those outcries also validate [Holden], [Shannon], and [Cathy]?

A. Yes, they do.

Q. And they had no contact either?

A. None.

. . .

Q. Ms. Hachtel, do you believe it happened?

A. Everything in my body says it happened.

Q. Do you believe that Patrick "Booger Red" Kelly was involved?

A. Directly involved.

Q. As was Jamie Pittman and Shauntel Mayo?

A. Yes, sir.

Q. What about Dennis Pittman?

A. Actively involved.

**Direct Examination of Phillip Kemp, Texas Range, not designated as outcry witness**

Q. We have talked about [Shannon]. Did she have any behaviors that were indicators of sexual abuse?

MR. DAVIDSON: Your Honor, objection, lack of personal knowledge; lack of qualifications.

This person is not a psychologist, a licensed professional counselor, or psychiatrist, SANE nurse, M.D., or child expert.

THE COURT: That objection is overruled.

MR. DAVIDSON: Objection, also calls for hearsay; violation of confrontation clause.

THE COURT: Those are overruled, too.

A. I believe so, yes

. . .

Q. Before we get any further, were any threats made against [Shannon] regarding what would happen to her if she told anybody what had happened?

MR. DAVIDSON: Objection, leading; objection, lack of personal knowledge; objection, hearsay; and objection, violation of confrontation clause.

THE COURT: Those objections are overruled.

A. Yes. . . .

I'm not able to recall what specific threat was, but I do remember that it was at Vacation Bible School, at least one of them was at the Vacation Bible School.

MR. DAVIDSON: Your Honor, objection, same objections I made before. Number one, hearsay; lack of personal knowledge; violation of confrontation clause.

THE COURT: Same ruling by the Court. They're overruled.

Q. (By Mr. Murphy) Was [Shannon] able to tell you who hurt her?

MR. DAVIDSON: Same objections, Your Honor.

THE COURT: Same ruling.

A. Yes, sir.

Q. Did she tell you who made her do all of this?

MR. DAVIDSON: Objection, calls for hearsay; calls for violation of confrontation clause; lack of personal knowledge.

THE COURT: Objection is overruled.

A. Yes, sir, she did.

Q. (By Mr. Murphy) Who?

A. Jamie Pittman, Sheila Sones.

MR. DAVIDSON: Your Honor, again, I need to renew my running objection at this time.

THE COURT: It's there.

MR. DAVIDSON: Thank you.

A. Shauntel Mayo, Jimmy Sones, Patrick Kelly, Dennis Pittman.

. . .

Q. (By Mr. Murphy) When you talked to [Shannon], is there anything that she told you that gave you any type of concern about her fabricating or making up what she told you?

MR. DAVIDSON: Your Honor, objection, leading; objection, calls for hearsay; objection, violation of the confrontation clause; Sixth Amendment U.S. Constitution; Article 1, Section 10, Texas Constitution.

THE COURT: All of those objections are overruled.

A. There was no concerns.

. . .

Q. (By Mr. Murphy) Were they able to tell you who all was involved—what all adults, excuse me—were involved in kindergarten?

A. Yes, sir.

Q. Who were those adults?

A. One was Patrick Kelly.

MR. DAVIDSON: Your Honor, again, objection. Same objections I just made:

Confrontation clause, hearsay, lack of personal knowledge.

THE COURT: They're on the record. Same ruling by the Court.

A. One was Patrick Kelly. It was conducted at his residence. Two was Shauntel Mayo, Jamie Pittman, Jimmy Sones.

. . .

Q. What would they do at the club?

A. They would perform sex acts. These acts would be videotaped

MR. DAVIDSON: Objection, calls for hearsay; lack of personal knowledge; calls for speculation; objection, violation of confrontation clause, U.S. and Texas Constitutions.

THE COURT: All of those objections are overruled.

A. They would perform sex acts. These acts would be videotaped. And they would also perform live in front of paying customers.

Q. (By Mr. Murphy) These sex acts—based on your investigation, did [Holden] and [Shannon] ever engage in any of these sex acts?

MR. DAVIDSON: Your Honor, objection, calls for speculation; lack of personal knowledge; hearsay; and violation of confrontation clause, U.S. Constitution and Texas Constitution.

THE COURT: Those objections are overruled.

A. Yes, they did.

Q. (By Mr. Murphy) When engaged in these sex acts—I'm not going to get in detail with you; they might, but I'm not going to—did their privates touch each other?

A. Yes, sir.

MR. DAVIDSON: Same objections, Your Honor.

THE COURT: Same ruling.

Q. (By Mr. Murphy) Who benefited from [Shannon] and [Holden] performing sex acts on one another?

MR. DAVIDSON: Objection, Your Honor, relevancy, number one; number two, lack of personal knowledge; number three, calls for hearsay; calls for speculation; and number five, violation of confrontation clause, U.S. and Sixth Amendment and Texas Constitutions.

THE COURT: Overruled.

A. Everyone involved in the club.

Q. (By Mr. Murphy) Does that include, but not limited to, the defendant, Patrick "Booger Red" Kelly?

A. Yes, sir.

Q. How did they benefit?

MR. DAVIDSON: Objection again, Your Honor, hearsay; speculation; lack of personal knowledge; violation of the confrontation clause.

. . .

(At the bench, on the record.)

. . .

MR. MURPHY: I'm just saying—I'm sorry, Judge. I'm just saying, obviously, these are prior consistent statements; obviously, they are admissible. And I guess if he wants to object to every question, he can.

For the record, I want to put in the reason for me asking these questions. They are prior consistent statements.

THE COURT: I understand.

MR. DAVIDSON: Which he did not personally observe. Hearsay.

THE COURT: That's right. He wasn't in the club. That's right. I'm overruling. I've made my ruling. I've overruled your objections.

. . .

Q. (By Mr. Murphy) How did they benefit?

A. Monetarily.

Q. When I say "they," does that include, but not limited to, the defendant?

A. Yes, sir.

Q. Other than [Holden] and [Shannon], did you ever talk to [Cathy]?

A. Yes, I did.

Q. Now, had [Cathy] always been with [Shannon] and [Holden]?

MR. DAVIDSON: Objection, leading, Your Honor; also, objection, lack of personal knowledge; calls for speculation.

THE COURT: Objections are overruled.

A. No sir, she was not.

. . .

Q. Are you aware of the reason for her being reunited with them?

A. Allegations she had made an outcry of possible sexual abuse as well and was removed.

MR. DAVIDSON: Objection, calls for speculation; lack of personal knowledge; calls for hearsay; violation of confrontation clause.

THE COURT: Okay. Well, he's answered the question. The objections are overruled.

Q. (By Mr. Murphy) Briefly talking about [Cathy], did [Cathy] exhibit any signs of sexual abuse?

A. Yes.

MR. DAVIDSON: Objection, calls for speculation; hearsay; lack of personal knowledge.

THE COURT: Objections are overruled.

Restate that question, Mr. Murphy.

Q. (By Mr. Murphy) What were those signs?

A. She was, at various points, including currently, in the past few months, still masturbating.

Q. How would you describe her masturbation?

MR. DAVIDSON: Objection, Your Honor, lack of personal knowledge. This witness did not observe anything like that. This calls for rampant speculation; also, hearsay; violation of confrontation clause.

THE COURT: Those objections are overruled.

Could you keep your voice up, Ranger Kemp, please?

Q. (By Mr. Murphy) How would you describe her masturbation?

A. Well, first of all, she would, for lack of a better term, hump the laundry, and she would also masturbate to the point of causing herself to bleed.

MR. DAVIDSON: Your Honor, I have to renew the same objections that I just made a few seconds ago.

THE COURT: Same ruling by the Court.

. . .

Q. (By Mr. Murphy) Did [Cathy] ever tell you if anybody hurt her?

A. Yes, sir.

Q. Who did she say hurt her?

MR. DAVIDSON: Your Honor, objection, hearsay.

THE COURT: Objection is overruled.

MR. DAVIDSON: Violation of the confrontation clause.

THE COURT: That's overruled, too.

A. The ones that were instructing her.

. . .

Q. Did [Alicia] talk about being sexually abused?

MR. DAVIDSON: Your Honor, objection, leading.

THE COURT: Objection is overruled.

A. Yes, sir, she did.

Q. (By Mr. Murphy) Did [Alicia] include the defendant, Patrick "Booger Red" Kelly, as one of those individuals who abused her?

MR. DAVIDSON: Objection, Your Honor. This calls for hearsay; it calls for speculation; and it also calls for a violation of the confrontation clause.

THE COURT: Those are all overruled.

A. I don't recall if she talked about him or not.

. . .

Q. When you were investigating this offense, were you able to determine, first of all, whether or not a group of people collaborated in carrying out these offenses for their own monetary gain?

MR. DAVIDSON: Objection, leading question; narrative question. The prosecutor is testifying.

THE COURT: Those objections are overruled.

MR. DAVIDSON: Your Honor, objection. Again, this question calls for a legal conclusion by a person who is not a lawyer or a judge.

THE COURT: Those objections are overruled.

. . .

Go ahead and restate the question, Mr. Murphy.

Q. (By Mr. Murphy) Through the course of your investigation, were you able to determine whether or not a group of individuals were involved in collaborating and carrying out the criminal activity that we've talked about?

A. Yes, sir.

Q. Did they do so for their own monetary gain?

MR. DAVIDSON: Objection, Your Honor. Calls for hearsay; speculation; lack of personal knowledge; violation of the confrontation clause.

THE COURT: Same ruling by the Court, overruled.

A. Yes, sir.

Q. (By Mr. Murphy) When talking about the criminal activity, does that criminal activity include, but not limited to, [Holden] and [Shannon] playing doctor together?

MR. DAVIDSON: Your Honor, objection. Leading question; lack of personal knowledge; calls for speculation; violation of the confrontation clause; U.S. Sixth Amendment; Texas, Article 1, Section 10.

THE COURT: Those objections are overruled.

Q. (By Mr. Murphy) Playing doctor—through your investigation, was playing doctor, did it involve the private parts, the male and female genitalia, to touch one another?

MR. DAVIDSON: Again, Your Honor, objection, lack of personal knowledge; calls for hearsay; calls for violation of the confrontation clause; U.S. Sixth Amendment; Article 1, Section 10, Texas Constitution.

THE COURT: All of those objections are overruled.

You need him to rephrase that question—rephrase it?

THE WITNESS: No, sir.

THE COURT: You got it?

THE WITNESS: Yes, sir, I did.

[No answer]

Q. (By Mr. Murphy) When we talk about that group, was Patrick Kelly in that group?

MR. DAVIDSON: Same objections, Your Honor.

THE COURT: Same ruling, Mr. Davidson.

A. Yes, sir.

Q. (By Mr. Murphy) Is there anything about your two-year investigation that gives you pause or concern as to the veracity of what those children say?

A. No, sir.

. . .

Q. (By Mr. Murphy) Through the course of your investigation, were you able to determine what happened to them [the videotapes]?

A. They were destroyed.

Q. Where were they destroyed?

MR. DAVIDSON: Objection, lack of personal knowledge; calls for speculation.

THE COURT: If it's based on his investigation, he can answer.

A. At Patrick Kelly's residence.

Q. (By Mr. Murphy) The defendant, Booger Red's house?

A. Yes, sir.

Q. Which is here in Smith County?

A. Yes, sir.

Q. What county would the children leave—when I talk about the children specifically, [Shannon] and [Holden]—what would they leave in order to go to swingers' club?

MR. DAVIDSON: Your Honor, objection. This is a grotesquely leading question; calls for speculation; and lack of personal knowledge of the witness.

THE COURT: The Court's ruling is those objections are overruled.

A. They would leave Smith County.

Q. (By Mr. Murphy) What was the purpose of those children, based on your investigation, leaving Smith County, going to the Mineola swingers' club; what was the purpose of that?

A. To perform sex acts at the club.

Q. What would happen to the kids if they didn't perform the sex acts, based on your investigation?

MR. DAVIDSON: Objection, calls for hearsay; calls for speculation; lack of personal knowledge on the part of the witness; and violation of the confrontation clause; Article 1, Section 10, Texas Constitution; as well as Sixth Amendment, U.S. Constitution.

THE COURT: Those objections are overruled.

A. They would be—food would be withheld from them, and they would not be able to eat.

Q. (By Mr. Murphy) Did they say whether or not they liked it?

MR. DAVIDSON: Objection, Your Honor. Objection to form; and also objection, leading.

THE COURT: Rephrase the question, Mr. Murphy.

Q. (By Mr. Murphy) Through the course of your investigation, did it ever appear as if they enjoyed what they were doing in that club?

MR. DAVIDSON: Your Honor, objection, lack of personal knowledge; speculation and form.

THE COURT: Overruled.

A. They did not.