

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00082-CR

STEVEN KEITH GREEN                                                                        APPELLANT

V.

THE STATE OF TEXAS                                                                             STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]
## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

----------

After reviewing Appellant Steven Keith Green's petition for discretionary review, we modify our opinion and judgment in this appeal.  *See* Tex. R. App. P. 50.  We withdraw our April 14, 2011 opinion and judgment and substitute the following.

---

[1]*See* Tex. R. App. P. 47.4.

# I. INTRODUCTION

Appellant Steven Keith Green appeals his conviction for three counts of aggravated sexual assault of a child younger than seventeen years of age. In two issues, Green argues that the trial court erred by denying his motion to suppress and by excluding certain evidence of the complainant's past sexual behavior. We will affirm.

# II. FACTUAL AND PROCEDURAL BACKGROUND

H.G. is Green's biological daughter. H.G. lived with her mother until she was eleven years old, when she moved in with Green and his wife Melissa. When H.G. was thirteen, she went on a trip to California with Green. Green and H.G. shared a bed in their hotel room, and one night, Green performed oral sex on H.G. Green also had H.G. perform oral sex on him during the trip.

The two continued performing oral sex on each other after they returned to Texas. At some point that year, while H.G. was still thirteen, Green began having sexual intercourse with her. Green and H.G. had sex in her room twice a week, and he always ejaculated into a towel. Melissa began noticing unusual behavior between Green and H.G.—H.G. always got in bed with Green when Melissa got up, they "spoon[ed]" on the couch, and Melissa twice saw H.G. lying on the couch with her face in Green's lap turned to his crotch. Green and H.G. texted each other frequently when they were in the same room with Melissa. Melissa moved out of the master bedroom and stayed in a different bedroom for about two months; during that time, H.G. and Green shared the same bed "every

2

night." Melissa thought the behavior was strange and even asked Green if he was having a sexual relationship with H.G. Green responded that the accusation was disgusting because H.G. was his daughter. Melissa ultimately moved out when H.G. was fifteen or sixteen.

After Green and Melissa separated, Green and H.G. continued living together alone. When H.G. was sixteen, she and Green moved into a two-bedroom apartment in Crowley, where they continued to have sexual relations. Green worked out of town, and H.G., who had dropped out of school, lived there alone during the week. The two shared a bedroom in the apartment when Green returned on weekends, and they had sex each weekend.

H.G.'s brother Daniel, who also stayed at the apartment from time to time, testified that he always slept on the couch and that H.G. and Green slept in the same bed together upstairs. Daniel testified that the living arrangements were "weird" but that he "just didn't want to think about it."

H.G. eventually told her maternal uncle about her and Green's sexual relationship. H.G., her uncle, her mother, and her stepfather went to the police station to report Green to the authorities. Officer Kevin Newman of the Crowley Police Department later escorted H.G. to the apartment she shared with Green to get her things. While they were there, H.G. showed Officer Newman the bed she and Green shared; she pointed out two towels on the floor beside the bed and informed the officer that Green had ejaculated onto the towels the last time they

3

had sex. Officer Newman took a sheet from the bed and the two towels for DNA testing.

DNA samples taken from the same quarter-inch section of one of the towels matched H.G.'s epithelial cells and Green's sperm cells. DNA samples from the other towel and from the sheet also matched Green's sperm cells and contained a minor component of epithelial cells compatible with H.G.'s DNA.

A jury found Green guilty of all three counts of sexual assault of a child, and after a punishment hearing where the jury heard evidence of Green's prior felony conviction for burglary of a vehicle, the jury assessed Green's punishment at seventy-five years' imprisonment for each count. The trial court sentenced Green accordingly, ordering that the sentences be served consecutively.

### III. MOTION TO SUPPRESS

In his first issue, Green argues that the trial court abused its discretion by denying his motion to suppress the towels and bed sheet seized by Officer Newman when he escorted H.G. to the apartment that she and Green shared. Green argues that H.G., as a minor, lacked the capacity to consent to the search of the bedroom.[2]

---

[2]Green also argues on appeal that H.G lacked capacity to consent to a search because she was no longer living at the apartment and that the search was unreasonable because Officer Newman did not attempt to contact him before the search. But Green did not present these arguments in his motion to suppress or at the suppression hearing. Consequently, he failed to preserve these arguments for appeal. *See* Tex. R. App. P. 33.1; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (holding issue not preserved when objection at trial does not comport with issues raised on appeal); *Martinez v.*

4

## A. Standard of Review and Law on Consent Searches

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). A warrantless police entry into a person's home is presumptively unreasonable unless it falls within the scope of one of a few well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973); *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007). One such exception is a consensual entry. *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043–44 (1973); *Johnson*, 226 S.W.3d at 443.

Consent to enter and search property can be given either by the individual whose property is searched or by a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990); *Patrick v. State*, 906 S.W.2d 481, 490 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996). The third party may, in her own right, give valid consent when she and the absent, non-consenting person share common authority over the premises or property. *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010); *see United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974); *Becknell v. State*, 720 S.W.2d 526, 528 (Tex. Crim. App. [Panel Op.] 1986)*, cert. denied*, 481 U.S. 1065 (1987). Common authority

---

*State*, 17 S.W.3d 677, 682 (Tex. Crim. App. 2000) (holding argument based on lack of authority to consent to search was not preserved when only argument at trial was voluntariness of consent).

derives from the mutual use of the property, not the ownership or lack thereof. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011); *Matlock*, 415 U.S. at 171, 94 S. Ct. 988, *Maxwell v. State*, 73 S.W.3d 278, 282 (Tex. Crim. App.), *cert. denied*, 537 U.S. 1051 (2002).  The validity of an alleged consent to search is a question to be determined from all the circumstances.  *Maxwell*, 73 S.W.3d at 282.

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor.  *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  Determinations of actual and apparent authority are reviewed de novo as mixed questions of law and fact. *Limon*, 340 S.W.3d at 757.  When a trial court does not enter findings of fact, as here, a reviewing court must view the evidence in a light most favorable to the trial court's rulings and assume that the trial court resolved any issues of historical fact or credibility consistently with its ultimate ruling.  *See id.*

## B. Authority to Consent

Here, Green testified at the suppression hearing that he and H.G. lived in the apartment together, that H.G. had a key, and that she was listed on the lease as an occupant. The apartment had two bedrooms, one of which had a king-sized bed in it and the other had a baby bed in it.[3] The room with the king-sized bed, which was the room from which Officer Newman took the towels and sheet, was both H.G.'s and Green's bedroom; according to Green, it was H.G.'s room when Green was out of town during the week, and it was his room when he was at home on the weekends. Thus, based on the record from the suppression hearing, the trial court could have found that H.G. had authority to consent to the removal of these items from the bedroom because, at a minimum, she shared common authority over the bedroom. *See Hubert*, 312 S.W.3d at 560; *see also Matlock*, 415 U.S. at 171, 94 S. Ct. at 993; *Becknell*, 720 S.W.2d at 528.

Thus, the question becomes whether the fact that H.G. was a minor prevented her from being able to consent to the removal of items from the bedroom that she shared with her father. The court of criminal appeals recently rejected a per se rule that children may, or may not, consent to entry into a residence. *Limon*, 340 S.W.3d at 756. The court explained, "Under given circumstances, and taking into account 'widely shared social expectations' and

---

[3]H.G. had a baby with another man. We will address the exclusion of this evidence in Part IV of this opinion.

7

'commonly held understanding,' it may be reasonable or unreasonable to believe that a child has authority to consent to a particular intrusion." *Id.* at 257.

Here, sixteen-year-old H.G. had been living in the apartment by herself five days out of the week, with no adult supervision; she had been driving herself to her job at a fast-food restaurant; and she had a five-month-old baby. *See Russell v. State*, 739 S.W.2d 923, 927 (Tex. App.—Dallas 1987, pet. dism'd) (holding sixteen-year-old defendant freely and voluntarily consented to search of her residence when she said, and acted like, she was eighteen years old); *see also Limon*, 340 S.W.3d at 758 (considering fact that minor "appeared to be at least a teenager of significant maturity, if not a young adult," in holding that he possessed apparent authority to consent to the entry into another's home). Moreover, Officer Newman was not there to search the apartment for evidence of a crime; he had accompanied H.G. there so that she could move her things out of the house, and while there, she directed him to the sheet and towels. Viewing the totality of the circumstances surrounding H.G.'s consent, we hold that the fact that she was a minor did not prevent her from freely and voluntarily consenting to Officer Newman seizing the towels and bed sheet that she directed him to in the bedroom that she shared with her father. *See Maxwell*, 73 S.W.3d at 281. Consequently, we hold that the trial court did not err by denying Green's motion to suppress, and we overrule Green's first issue.

## IV. RULE 412 EVIDENCE

In his second issue, Green argues that the trial court violated his confrontation rights under the Sixth Amendment to the United States Constitution by excluding evidence of H.G.'s past sexual behavior. Green argues that the evidence was admissible under Texas Rule of Evidence 412 (the "rape shield law") to show that H.G. had a bias against him and a motive to falsely accuse him of sexual assault. The State contends that the evidence was not admissible under rule 412 and that, alternatively, any error in excluding the evidence was harmless.

### A. Standard of Review

We review a trial court's decision to admit or to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *see also Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App.) (explaining that a trial court "maintains broad discretion to impose reasonable limits on cross-examination to avoid, inter alia, harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence"), *cert. denied*, 522 U.S. 917 (1997). A trial court does not abuse its discretion as long as the decision to admit or to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g).

## B. Confrontation Rights and Rule 412

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974). The Sixth Amendment right of confrontation is a fundamental right and is applicable to the states by virtue of the Fourteenth Amendment. *Pointer v. State*, 380 U.S. 400, 403, 85 S. Ct. 1065, 1067–68 (1965); *Shelby v. State*, 819 S.W.2d 544, 546 (Tex. Crim. App. 1991). The right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. *Allen v. State*, 700 S.W.2d 924, 929, 931 (Tex. Crim. App. 1985) (holding that precursor to rule 412 was constitutional and did not, on its face, violate accused's right to confrontation); *see also Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 1046 (1973). Moreover, the Constitution requires only the introduction of otherwise relevant and admissible evidence. *See United States v. Nixon*, 418 U.S. 683, 711, 94 S. Ct. 3090, 3109 (1974).

Texas Rule of Evidence 412, known as the rape shield law, governs the admissibility of a complainant's prior sexual relationships with third parties in a sexual assault case. *See* Tex. R. Evid. 412. Rule 412(b) provides that specific instances of a victim's past sexual conduct are inadmissible unless (1) the evidence falls within one of five categories of evidence listed in rule 412(b)(2),

and (2) the trial court finds that the probative value outweighs the danger of unfair prejudice. *See* Tex. R. Evid. 412(b). Even if the evidence falls within the enumerated categories of rule 412(b)(2), the court must further find that the probative value of the evidence outweighs the danger of unfair prejudice. *See Holloway v. State*, 751 S.W.2d 866, 869–70 (Tex. Crim. App. 1988); *Stephens v. State*, 978 S.W.2d 728, 732 (Tex. App.—Austin 1998, pet. ref'd).

Rule 412 attempts to limit abusive, embarrassing, and irrelevant inquiries into a complainant's private life and to encourage victims of sexual assault to report those crimes. *See Allen*, 700 S.W.2d at 929; *Wofford v. State*, 903 S.W.2d 796, 798 (Tex. App.—Dallas 1995, pet. ref'd). The court of criminal appeals has expressed the rationale of provisions such as rule 412 by stating that

> evidence of a rape victim's prior sexual activity is of dubious probative value and relevance and is highly embarrassing and prejudicial. Often such evidence has been used to harass the prosecuting victim. Sponsors of these statutes assert that they encourage victims of sexual assault to report the crimes without fear of having their past sexual history exposed to the public.

*Allen*, 700 S.W.2d at 929 (quoting *Bell v. Harrison*, 670 F.2d 656, 658 (6th Cir. 1982)).

### C. Rule 412 Hearing

At trial, defense counsel attempted to offer evidence that H.G. made the sexual assault allegations against Green in retaliation for his bringing sexual

11

assault charges against Donald Fincher, the father of her baby. The trial court permitted defense counsel to make an offer of proof in a rule 412 hearing.

During the hearing, H.G. testified that when she was fifteen, she and Fincher, who was twenty-eight or twenty-nine at the time, had a sexual, "voluntary relationship" for a few weeks. They had sex more than one time on a single occasion, and H.G. got pregnant.[4] In March 2007, H.G. told Green that she was pregnant with Fincher's child, and Green forced her to go to the police department to file charges against Fincher. H.G. testified that she did not want to file charges, but she denied ever threatening Green that she would put him in jail if she found out that he had anything to do with Fincher's prosecution. H.G. ultimately went to the police station with Green, wrote a statement explaining what had happened between her and Fincher, and submitted to a DNA test. In November 2007, Green and H.G. learned that Fincher had accepted a ten-year sentence for what he had done to H.G. That same month, H.G. told her uncle about her sexual relationship with her father.

Green also testified that H.G. had not wanted to file charges against Fincher but that Green had told H.G. that her baby could be taken away if she "did not do what was right." According to Green, in March 2007, when H.G. told him that she was pregnant, she threatened Green that "if she found out that [he] pressed charges [on Fincher], she would have [Green] put in jail as well." Green

---

[4]DNA testing revealed that Fincher was the father of H.G.'s baby.

12

said that H.G. only made that one threat. Around Thanksgiving 2007, approximately five months after the baby was born and nine months after H.G. had allegedly threatened Green, Green and H.G. learned of Fincher's plea bargain. Green testified that he "didn't notice a reaction" in H.G. when they heard the news.

H.G.'s uncle testified that H.G. had denied that Fincher was her boyfriend and had instead told her uncle that she wanted to prosecute Fincher because he had raped her.

At the end of the rule 412 hearing, defense counsel argued that the evidence was admissible "to show bias or prejudice on the part of the victim in this case, that she made at least one threat that she would see [Green] put in jail over the Donald Fincher allegations and prosecution, and therefore, this is the linchpin to our defense." The trial court ultimately sustained the State's objection to the introduction of any evidence that H.G. had sexual relations and a baby with Fincher. The court stated, "If you want to put your client on in front of [the] jury, I'll let you do it, and I'll let you ask him . . . if [H.G.] ever threatened him. But you won't go into the underlying – any underlying sex on the part of this witness. That's a violation of the statute, the Texas law."

## D. Harmless Error

We will assume that the trial court abused its discretion by prohibiting Green from introducing the proffered testimony to support his defensive theory and that the proffered evidence formed such a vital portion of Green's case that

13

its exclusion effectively precluded him from presenting a defense; consequently, we will conduct a harmless error analysis under rule 44.2(a). *See* Tex. R. App. P. 44.2(a); *Rubio v. State*, 241 S.W.3d 1, 3 (Tex. Crim. App. 2007); *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002) ("[T]he exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense.").

Under rule 44.2(a), we must reverse unless we determine beyond a reasonable doubt that the error did not contribute to Green's conviction or punishment. Tex. R. App. P. 44.2(a). The question is whether the trial court's failure to allow Green to introduce evidence of H.G.'s past sexual behavior to show her bias or motive to lie was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the source and nature of the error, the extent that it was

14

emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "'in the light most favorable to the prosecution.'" *Id.* at 586 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).

After a careful and neutral review of the record, we conclude beyond a reasonable doubt that the exclusion of this testimony did not contribute to Green's conviction or punishment. *See* Tex. R. App. P. 44.2(a). This is not just a case of "he said, she said." *Cf. Billodeau v. State*, 277 S.W.3d 34, 42 (Tex. Crim. App. 2009) ("In many sexual-assault cases, the only evidence linking the accused to the offense is the complainant's accusations."); *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (recognizing that in prosecutions for sexual offenses, a successful conviction "'often depend[s] primarily on whether the jury believe[s] the complainant, turning the trial into a swearing match between the complainant and defendant'" (citation omitted)); *Kelly v. State*, 321 S.W.3d 583, 594 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (noting, in holding that exclusion of evidence was harmful under rule 44.2(a), that "the believability of the children's testimony is at the heart of this case"). Rather, the State presented scientific evidence showing that H.G.'s epithelial cells and Green's sperm cells were found on two towels next to the bed that they shared

and on a sheet taken from their bed. Green's ex-wife and H.G.'s brother both testified to suspicious behavior between Green and H.G., including that they shared a bedroom and spooned on the couch together with H.G.'s face in Green's crotch. Thus, while H.G.'s testimony that her father had sexually abused her was no doubt important to the State's case, the State also relied on other testimony and scientific evidence to establish that Green had sexually assaulted H.G.[5] *Cf. Stephenson v. State*, 226 S.W.3d 622, 628 (Tex. App.—Amarillo 2007, no pet.) (holding that when State presented no evidence tying defendant to crime other than complainant's identification of defendant as perpetrator, wrongful exclusion of defense expert testimony pertaining to reliability of eyewitness

---

[5]The State emphasized the other evidence of guilt during closing argument:

> But did the State bring you more [than H.G.'s testimony]? Yes. The State brought you much more. The State brought you her brother, Daniel, who said when he spent the night, [H.G. and Green] went upstairs and spent the night together in the one bed in the house and came down together. That's strong evidence that a biological father is sleeping with his biological daughter.

> Was there more? Yes. We brought you more. We brought you the ex-wife, Missy. And what did she tell you? She constantly saw the two of them in bed together. She saw the two of them snuggling together on the couch in an [in]appropriate way. She said for the last month or two they were married, she was off in a totally different bedroom and [Green] and [H.G.] are sharing a bedroom every single night . . . .

> We have the two officers that investigated the case and filed the case and gathered the evidence. But is there even more? Yes. There is DNA. And [Green] cannot escape his DNA. That is the ultimate damning proof for this defendant.

identification of suspect was harmful); *Fox v. State*, 115 S.W.3d 550, 564 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (holding as harmful under rule 44.2(b) the exclusion of evidence that supported defense's theory under doctrine of chances when State's case boiled down to complainant's allegation of sexual abuse, inconclusive physical evidence, and weak circumstantial evidence); *see also Reed v. State*, No. 02-02-0055-CR, 2003 WL 1894581, at *7 (Tex. App.—Fort Worth Apr. 17, 2003, pet. ref'd) (op. on reh'g) (not designated for publication) ("The story told by the physical evidence in this case is simply so strong that we cannot conclude the jury would have been influenced by . . . testimony concerning the statement Samantha made in the emergency room.").

Moreover, Green testified at the rule 412 hearing that H.G. had threatened to "put him in jail" if he reported Fincher to the police. While Green's testimony shows that H.G. had threatened to tell the police about their relationship, it does not establish that she threatened to *falsely* accuse him of sexual assault.[6] And the evidence shows that she made this threat a single time, months before she actually made her outcry, and that at no point during the police investigation in Fincher's prosecution did she ever tell the police about her relationship with Green.

---

[6]As the State points out, H.G. could have threatened to put Green in jail if he pressed charges on Fincher because, according to her own testimony, she thought that her relationship with Fincher was "voluntary" and that "it wasn't right" to prosecute him for their consensual relationship. And at trial, H.G. testified that Green had once told her that if she ever told anyone about their relationship, he "would go to jail for a long time."

We recognize that the jury is the ultimate factfinder on such issues as the credibility of the witnesses and the weight to be given to their testimony. *See Billodeau*, 277 S.W.3d at 43. But in light of the strong scientific and circumstantial evidence of Green's guilt and the tenuous implication that a single threat to put Green in jail—made months before H.G. made her outcry—was a threat to falsely accuse him, we cannot conclude that the jury would have been influenced by the excluded testimony. *See Wesbrook*, 29 S.W.3d at 119. After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's alleged error did not contribute to Green's conviction or punishment. *See* Tex. R. App. P. 44.2(a).

## V. CONCLUSION

Having overruled Green's two issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and MCCOY, JJ.

MCCOY, J. filed a concurring opinion for which DAUPHINOT, J. joins.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 4, 2011

18



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-10-00082-CR

STEVEN KEITH GREEN                                                APPELLANT

V.

THE STATE OF TEXAS                                                 STATE

----------

## FROM THE 432ND DISTRICT COURT OF TARRANT COUNTY

----------

## CONCURRING MEMORANDUM OPINION[1]

----------

I concur in the result reached by the majority, but I would hold there was error, in the suppression of evidence concerning H.G.'s sexual relationship with Donald Fincher. There is an important distinction between an attack on the general credibility of a witness and a more particular attack on credibility that reveals "'possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand.'" *Hammer v.*

---

[1]*See* Tex. R. App. P. 47.4.

*State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974)). Evidence of a victim's prior sexual activity may be admissible under rule 412 when offered to establish the victim's motive or bias against the defendant. *Id.* at 566.

In the rule 412 hearing, Green argued that H.G. was angry at him when he forced her to press charges against Fincher, the father of her child. The unsealed court records confirmed Fincher's paternity and H.G.'s complaint against Green coincided with Fincher's sentencing. Green testified that H.G. threatened him that if he forced her to press charges against Fincher, she would have him (Green) put in jail as well. H.G. testified that she had a "voluntary relationship" with Fincher, that she did not want to file charges against him, and that Green had forced her to do so. She also denied threatening Green. H.G.'s uncle testified that H.G. told him that she wanted to prosecute Fincher because he had raped her, which directly contradicted H.G.'s testimony about the nature of her relationship with Fincher. Taken together, the testimonial discrepancies raise a fact question about possible motive or bias behind H.G.'s complaints against Green. Therefore, because H.G.'s testimony was relevant for the jury to determine motive or bias, and although it was harmless error, the trial court erred by excluding it.

BOB MCCOY
JUSTICE

DAUPHINOT, J. joins.

2

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 4, 2011